# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 18, 2018

## KATHERINE LOUISE HOLMES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
No. 2012-A-90    Mark Fishburn, Judge

No. M2017-01479-CCA-R3-PC

FILED

AUG 0 7 2018

Clerk of the Appellate Courts
Rec'd By _____

The petitioner, Katherine Louise Holmes, appeals the denial of her petition for post-conviction relief, which petition challenged her 2012 conviction of attempted first degree murder, alleging that she was deprived of the effective assistance of counsel at trial. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Jesse Lords, Nashville, Tennessee, for the appellant, Katherine Louise Holmes.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Davidson County Criminal Court jury convicted the petitioner of one count of attempted first degree murder, and the trial court imposed a Range I sentence of 22 years' incarceration. This court affirmed both the conviction and sentence on direct appeal, and our supreme court denied the petitioner's application for permission to appeal. *See State v. Katherine Louise Holmes*, No. M2014-00420-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Nashville, July 13, 2015), *perm. app. denied* (Tenn. Oct. 15, 2015).

"This case arose after the [petitioner], who was in the midst of divorce proceedings, convinced Barry Haslip to shoot her husband, the victim."[1] *Id.*, slip op. at 2. After exchanging daily text messages with the petitioner wherein the petitioner proclaimed her love for him and asked him to "handle" the victim, Mr. Haislip met with the petitioner in-person, and she asked Mr. Haislip to "'take care of' the victim." Mr. Haislip ambushed the victim while the victim and the petitioner were completing their custody exchange and shot the victim once in the back of the head using his grandfather's revolver. *See id.*, slip op. at 2-4. This court provided a succinct summary of the proof in its discussion of the sufficiency of the convicting evidence:

> [T]he [petitioner] and Mr. Haslip had a conversation about killing the victim. This discussion occurred less than two weeks before a scheduled hearing to impose a temporary parenting plan regarding custody of the [petitioner's] and the victim's children. Mr. Haslip testified that on the day before the shooting the [petitioner] informed him that her custody battle was not going well, and Mr. Akers testified that the temporary parenting plan was almost certain to be unfavorable for the [petitioner]. The [petitioner] asked Mr. Haslip if he had a gun. She drove [Mr. Haslip] to the apartment complex and identified where and when the shooting should take place. She told him what to wear and where to position himself to shoot the victim. She also described the car that the victim would be driving so that Mr. Haslip could identify the person that he was supposed to shoot. When Mr. Haslip expressed reservation about the shooting and wanted to delay it, the [petitioner] said that it had to occur as scheduled because she did not know where the victim would be later and she would not have access to him.

*Id.*, slip op. at 16.

The petitioner filed a timely petition for post-conviction relief on July 26, 2016, alleging that her trial counsel performed deficiently by, among other things, failing to "subject the [S]tate[']s case to any meaningful, adversarial testing." She asserted that, without counsel's deficient performance, the result of her trial would have been different. Following the appointment of counsel, the petitioner filed an amended petition for post-

---

[1]     This individual's surname is spelled "Haslip" in this court's opinion on direct appeal and "Haislip" in both the indictment and the transcript of the evidentiary hearing. We will utilize the latter spelling in this opinion but not alter the spelling as it appears in quotations from the direct appeal opinion.

conviction relief, adding claims that trial counsel performed deficiently by, among other things, failing to conduct an adequate investigation into the case and failing to adequately prepare himself and the petitioner for the trial.[2]

At the evidentiary hearing,[3] the petitioner testified that another professor at the school she attended recommended that she hire trial counsel, who was also a professor at the school, to represent her at trial. After meeting with trial counsel, she hired him. The petitioner said that trial counsel told her that "he had taken several cases to trial before" but that she found out during trial "that there had evidently only been one and he had lost it." She said that trial counsel never provided her with the discovery materials and that, although they "set up times and stuff to meet," they "would never end up going over the case" and instead "were always going over other issues or other cases that he was working on." She said that counsel showed her "some thumbnail pictures . . . printed off on a page" and that he went "through text messaging phone records one time." She said that trial counsel never showed her the video recording of her pretrial statement to the police. Of those few discussions they had about her case, the petitioner said "it was all pretty straight forward." She could recall only a single occasion where her case had been the sole focus of their meeting. In that meeting, trial counsel told her that "he thought that [Mr. Haislip] was modeling his life after a Sons of Anarchy character."

The petitioner testified that she made monetary payments to trial counsel in addition to "doing work on his vehicle" and letting trial counsel borrow her vehicle. She said that she also helped counsel with legal research for his other cases and "kinda/sorta" acted as trial counsel's "legal assistant." The petitioner claimed that she also acted as an investigator on her own case, explaining, "[Trial counsel] was kind of using me as an investigator and stuff, because with my job, that was my line of work, so the only work that was brought in on my case was me coming up with ideas . . . ."

The petitioner testified that she had always intended to testify on her own behalf but that trial counsel did not prepare her to testify. She said that he did not subject her to cross-examination or discuss her potential testimony. The petitioner recalled that, after revoking her bond, the trial judge ordered trial counsel to show the video recording of her statement. She insisted, however, that she "[d]idn't get to watch the entire thing."

The petitioner testified that trial counsel failed to interview either the victim or Mr. Haislip prior to trial. She said that, when she asked about obtaining Mr. Haislip's medical records, trial counsel told her "that it wouldn't be pertinent to the trial." She said

---

[2] We have included only those claims raised by the petitioner on appeal.

[3] The evidentiary hearing was conducted on April 11 and May 4, 2017.

that she told trial counsel that Mr. Haislip had "pretended both to be part of a motorcycle gang and to be working undercover law enforcement."

The petitioner acknowledged that she had two cellular telephones at the time of the offense and that one of them was a Tracfone she had purchased at Walmart "about two to three months prior to the shooting" to act as a "back-up phone in case" something happened to her other cellular telephone. She used the Tracfone to contact Mr. Haislip. The petitioner said that, as far as she knew, trial counsel did not send either cellular telephone for forensic examination. She testified that "[t]he other only thing that" she "ever saw was a manually typed transcript" from Mr. Haislip's telephone "and some copies of phone records that were never authenticated or checked in, it was never anything official."

The petitioner testified that trial counsel did not attempt to prevent the trial court's revoking her bond and instead made only "a verbal protest" when the trial court indicated an intent to revoke her bond during trial.

During cross-examination, the petitioner acknowledged that she had spent more than a year studying criminal justice and that she had held positions in loss prevention at four different retail establishments before being charged in this case. Despite her familiarity with the criminal justice system, the petitioner did not ask to see the police reports about the shooting and did not ask to review the statement she had provided to the police. The petitioner said that she met with trial counsel two to three times a week during the seven months between her arraignment and her trial. She insisted, however, that they did not have "a standard attorney/client relationship," explaining,

> He was also my instructor and he was also going into it somebody like I trusted him, viewed as a friend, like I was around his family; he was around my family; he was at my parents' house; I would go to his house; I met his wife, his kid; I worked on his car. . . . [I]t wasn't a standard relationship, professional, you know, meeting in the office and that's that.

The petitioner acknowledged that, after the trial, she "was mad at everybody" and had asked "if people don't do their job and they don't do it right, is there steps that you can take, can you file complaints[?]" She said that she did not "think" she had "ever talked about suing the judge or the D.A." but that she had wanted to sue "individual people" who she claimed had committed perjury. She said that, as part of her duties in her job at CVS, she was able to "pull [Mr. Haislip's] purchases," but she said

-4-

that she could not remember whether she had asked one of the pharmacists to access Mr. Haislip's prescription records. She said that she did recall that Mr. Haislip came to the CVS to pick up "either Adderall or Ritalin, something for A.D.D." and that she thought Mr. Haislip's having "a mental deficiency of some sort" would have been helpful to her case and that she mentioned as much to trial counsel.

When asked what she believed to be the theory of defense at trial, she replied, "My concept of my defense was that I was innocent and that everything was going to work out and be okay. . . . I was gonna get up and testify and everybody was gonna tell the truth and it was gonna be some great thing, and it wasn't." She insisted that "[p]eople lied about the phones, about the phone records" and that "[p]eople lied to the police initially to focus the police's attention." She said that "there was all sorts of things that didn't come out properly" and cited as an example the victim's divorce attorney's testimony "about a hearing we had." The petitioner claimed that the police "lied about the cell phone and where the cell phone was found and how it was found and the information that was in the cell phone, all those things." She said that she believed her personality and her character would prevail over Mr. Haislip's.

When confronted with the fact that trial counsel's motion to obtain Mr. Haislip's medical records was denied, the petitioner still insisted that trial counsel was at fault for failing to properly use Mr. Haislip's potential mental illness. When confronted with the fact that both of her cellular telephones were subjected to forensic examination, the petitioner nevertheless complained that trial counsel "didn't use it like he should have because he could have used it to prove that the phone was messed with, so if he had the records and if he had gone after those records, . . . the phone would have never been an issue in the first place."

Upon questioning by the court, the petitioner clarified that she was not suggesting that the texts purportedly between her and Mr. Haislip were manufactured but that some of the text messages are missing, "as though it's taken out of context." She maintained that she had "never deleted anything from it."

Trial counsel testified that he was licensed to practice law in 2010 and that, in addition to his law practice, he worked as an instructor at "Daymar" teaching, among other things, torts, family law, civil procedure, and criminal procedure. He said that, prior to the petitioner's trial, he had represented several clients in criminal court and that he had participated in two jury trials. He said that the head of the criminal justice department at Daymar contacted him about "a student who had been implicated in a shooting . . . and needed to speak to a lawyer." He said that the professor asked him to handle the case, and he agreed to speak to the petitioner. Trial counsel testified that he told the petitioner during their initial meeting that he had only been practicing law since

-5-

2010 and that he would not be offended if she wanted to hire an attorney with more experience. According to trial counsel, the petitioner "said, no you're my guy, I'm staying with you."

Trial counsel testified that he went with the petitioner when she turned herself in to the police and that he immediately moved the trial court to reduce the petitioner's bond. The petitioner's bond was reduced, and she was later released on bond. He said that following the petitioner's release, the two met several times at his office. Trial counsel said that he

> always kind of got the impression that [the petitioner] viewed the pretrial and the trial as a mere formality; she believed that she was not guilty; she believed that she would be found not guilty; she believed that it didn't matter what happened prior to the trial because the trial was going to go her way and nothing would change that.

Trial counsel maintained that "[i]t was always difficult to get her to concentrate, to stay on point." He said that "she would want to talk about other things," that she often talked about suing people, and that she had asked in particular whether she could sue the prosecutor, the trial judge, and Mr. Haislip. Trial counsel recalled that on those occasions when the petitioner's boyfriend came to their meetings, "he was ready to go after five minutes, he didn't want to be there."

Trial counsel said that he attempted to provide the petitioner with discovery materials, giving her things during their meetings, but that he often found those things on his desk after she left. He testified that "[s]he would read through the discovery, but again, she didn't think it mattered, she didn't care, she was gonna be found not guilty, she believed she was gonna be found not guilty." He said that he spent a good deal of time familiarizing himself with the discovery materials and that, as a result, he "knew that case as well as anybody could."

Trial counsel said that he did "[n]ot really" consider sending the petitioner's Tracfone for forensic examination because even if he "could have shown that the messages were deleted," he could not have shown "who deleted them." He testified that, in his opinion, "it didn't matter if she had used the phone to call someone else, she was planning on testifying, and if it became an issue, she's gonna testify to it." Trial counsel said that the theory of defense was that the petitioner wanted Mr. Haislip to help her financially and to "help with digging up dirt" that could be used in her divorce and that he had misconstrued her pleas for help. He said that, if Mr. Haislip denied that, he intended to "bring in character witnesses, people who knew both of them, and let them

-6-

talk [a]bout people's character." Trial counsel maintained that, because the petitioner's "character was going to be better than [Mr. Haislip's], that was the theory of the defense, who do you believe, her or him."

Trial counsel said that he did not attempt to speak with the victim because he "had just been shot in the head." He recalled that he "spoke to [the victim's father] at one point and he wasn't going to allow [trial counsel] anywhere near" the victim. Trial counsel testified that he cross-examined the victim "quite extensively when he was on the witness stand, but [the victim] didn't remember a lot that happened that day, he had been shot in the head." Trial counsel said that, prior to trial, he interviewed all of the witnesses he intended to present as well as some of the witnesses for the State. He recalled that Mr. Haislip's attorney "wasn't comfortable letting his client talk to" trial counsel.

Trial counsel recalled that the Friday before trial, he learned that the petitioner's boyfriend "was investigated criminally for stealing from CVS" and that the petitioner had been implicated. Trial counsel said that if the information about that investigation came to light at trial, "it was gonna be bad." He said that the existence of the investigation limited the evidence he could present regarding the petitioner's good character.

During cross-examination, trial counsel reiterated that the discovery materials were "always available" to the petitioner and that he made copies of the materials and gave them to the petitioner but that she often left them at his office. Trial counsel acknowledged that he did not subpoena Mr. Haislip's medical records but said that he "filed a motion asking the Court to order that they be given to us." The trial court denied the motion. Trial counsel conceded that he did not ask for funds to hire an investigator and that he "did a good bit of" the investigating himself and that his paralegal assisted in the investigation.

Trial counsel said that he attempted to cross-examine Mr. Haislip about some of his more outlandish prior statements but that the trial court would not allow it. He said that he elected not to present witnesses to testify about the petitioner's good character after the court ruled that "if anyone testified on her behalf as a character witness," the State could ask those witnesses whether "they were aware that she was under investigation for . . . 'running a theft ring of some sort.'" He said that the ruling "really limited what we could do in terms of bringing witnesses in to testify to one person's character or the other." He said that "if any one of those witnesses had gotten on the witness stand," he would have been hard-pressed to limit their testimony to Mr. Haislip's character because "they were so completely gung ho to testify for her, to testify to her character." Had they done so, "the jury would have heard that she was under

investigation." He ultimately concluded that "the risk of [the jury's] hearing that she was being investigated for further criminal activity was too great."

Trial counsel conceded that he had not asked the trial court for funds to have the cellular telephones forensically examined, saying, "I never really understood what she was hoping to prove with the phones, other than what had already been done. The phones had been tested." He said that he did not move for dismissal of the case pursuant to *State v. Ferguson* based upon the deletion of text messages from the petitioner's Tracfone.[4] He said that the deletion of the text messages was irrelevant.

Nashville attorney Rich McGee, who was qualified as an expert in criminal defense, testified that he represented Mr. Haislip, who was also charged with attempted first degree murder. Mr. McGee successfully sought to have Mr. Haislip's trial severed from the petitioner's. He said that he had reviewed all of the discovery materials in the case and that he attended "a good portion of" the petitioner's trial. Mr. McGee recalled that trial counsel had asked to speak with Mr. Haislip prior to trial and that he would not allow him to do so. He said that he had no independent recollection of having received a request for Mr. Haislip's medical records but that he did recall the trial court's having denied such a motion. Mr. McGee said that, in any event, he would have fought to prevent trial counsel from obtaining Mr. Haislip's medical records.

Mr. McGee testified that trial counsel "had a tough case," particularly because the petitioner's "demeanor, her nonverbal body language all completely confirmed what Mr. Ha[i]slip was saying, that she is a strong woman and he is a weak man." He said that trial counsel "had a difficult client," adding, "Sometimes our worst witnesses are the persona that is generated by our own clients."

The victim, who was still married to the petitioner at the time of the hearing, testified that trial counsel did not attempt to contact him prior to the petitioner's trial. He also testified that the petitioner had contacted him from a telephone number that was not her normal number "two, maybe three or four" times, possibly in June, and that she had texted him from that number "[a] dozen, two dozen" times prior to the shooting. He had "no idea" whether the number from which the petitioner called was associated with the Tracfone discussed during the petitioner's trial. The victim said that he still owned the cellular telephone that he was using at the time of the shooting. He said that

---

[4]    In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (Tenn. 1999)).

neither the old text messages nor any record of that number would still exist on the phone.

At the conclusion of the hearing, the post-conviction court took the case under advisement. In the written order denying relief, the post-conviction court concluded that "the evidence shows that trial counsel interviewed all of the witnesses but Mr. Haislip and Mr. Holmes" and "that trial counsel attempted to speak to Mr. Haislip, but was denied access to him by his attorney." The court also found that, despite not being able to interview Mr. Haislip prior to trial, "trial counsel was able to get Mr. Haislip to admit most, if not all, of the evidence bearing on his credibility as a witness." The court found that, "[a]lthough trial counsel did not reach out to [the victim], trial counsel was aware that [the victim] did not remember anything about the incident itself which was borne out by his" testimony both at trial and at the evidentiary hearing.

As to the petitioner's claim that trial counsel's failure to interview the victim resulted in his not learning that the petitioner had texted the victim from the Tracfone, the post-conviction court concluded that "this evidence was presented to the jury" through the petitioner's testimony and "circumstantially corroborated" by Detective Corey Wall, who confirmed that the Tracfone contained a stored contact number for the victim. As to the petitioner's claim that trial counsel performed deficiently by failing to have the Tracfone forensically examined and by failing to make a *Ferguson* motion relative to the deleted text messages, the post-conviction court found that the petitioner "failed to present clear and convincing evidence that the forensic analysis would produce any potentially exculpatory evidence." The court observed that the petitioner bore the burden of producing at the evidentiary hearing the evidence that she claimed should have been presented at trial. The court also observed that "the evidentiary value of any texts not presented was insufficient" to impact the results of the petitioner's trial.

The post-conviction court determined that trial counsel did not perform deficiently by not obtaining copies of Mr. Haislip's medical records, observing that the record established that trial counsel did request the records and that the request was denied by the trial court. The court also noted that Mr. Haislip admitted that he had been diagnosed with attention deficit disorder and severe dyslexia. Similarly, the court rejected the petitioner's claim that trial counsel performed deficiently by failing to challenge the revocation of her bond, observing that "trial counsel did contest revoking her bond, but was unsuccessful."

The post-conviction court concluded that the petitioner had correctly stated that trial counsel had failed to request funds to hire an investigator, but she also had failed to "indicate any evidence that would have been discovered by the private investigator that was not revealed in discovery or in the defense's own investigatory efforts." The court

-9-

also concluded that, despite the petitioner's assertion to the contrary, her testimony at the evidentiary hearing suggested that "she and trial counsel had multiple substantive discussions about the case."

In this timely appeal, the petitioner asserts that the post-conviction court erred by denying post-conviction relief, reiterating her claim that she was deprived of the effective assistance of counsel at trial and arguing that trial counsel failed to adequately communicate with her and failed to adequately investigate the case and develop a trial strategy. The State contends that the post-conviction court did not err.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v.*

*State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In our view, the record fully supports the denial of post-conviction relief in this case. Trial counsel's accredited testimony establishes that he met with the petitioner frequently during the seven months preceding the trial and that he interviewed all relevant witnesses except the victim and Mr. Haislip. As to Mr. Haislip, both trial counsel and Mr. McGee testified that Mr. McGee prevented trial counsel from interviewing Mr. Haislip. As to the victim, trial counsel testified that the victim's father would not allow him to interview the victim, and, in any event, the record establishes that the victim had little or no memory of the shooting. Moreover, the petitioner grossly overestimates the probative value of any testimony the victim might have offered regarding the Tracfone. As is noted in this court's opinion on direct appeal, the petitioner testified at trial that she had used the Tracfone to contact the victim, and other testimony established that the victim's contact information was saved in the Tracfone. Trial counsel's accredited testimony also establishes that he attempted to provide the petitioner with discovery materials and to engage with her about the case but that she often left discovery materials behind in his office and appeared unconcerned about the pretrial procedure. Importantly, the petitioner failed to present any fact of consequence or any potential evidence that trial counsel might have discovered with further investigation.

The petitioner claims that trial counsel failed to develop a trial strategy, but trial counsel's accredited testimony establishes that he developed a trial strategy based upon the theory that Mr. Haislip had misconstrued the petitioner's requests that he help her during her divorce as a request that he kill the victim. Trial counsel testified that he intended to make the case about the credibility of Mr. Haislip and the petitioner. His strategy was first hampered by the trial court's refusal to permit him to offer evidence of some of Mr. Haislip's more outrageous boasts. His ability to bank on the petitioner's credibility was further hampered when, on the eve of the petitioner's testifying at trial, it became clear that the petitioner had been implicated along with her then-boyfriend in the running of "'a theft ring of some sort.'" Under the circumstances, trial counsel developed a reasonable, albeit unsuccessful trial strategy, and this court will not second-guess counsel's decision.

Accordingly, the judgment of the post-conviction court is affirmed.

-11-

_____

JAMES CURWOOD WITT, JR., JUDGE